UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:

LEHMAN BROTHERS SECURITIES AND
ERISA LITIGATION

This document applies to:                                                    09 MD 2017 (LAK)

*The People of the State of New York by Eric T.
Schneiderman, Attorney General of the State of
New York  v. Ernst & Young LLP*, 11 Civ. 384 (LAK)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


Appearances:


David Ellenhorn
Karla Sanchez
Eric T. Schneiderman
ATTORNEY GENERAL OF THE STATE OF NEW YORK
*Attorneys for Plaintiff*


Miles N. Ruthberg
Jamie L. Wine
Brian Kowalski
LATHAM & WATKINS LLP
*Attorneys for Defendant*


LEWIS A. KAPLAN, *District Judge.*

         The collapse of Lehman Brothers Holdings, Inc. ("Lehman") was a pivotal event in

the financial crisis, the effects of which remain very much with us.  It spawned a universe of

litigation, including this suit, which is an action by the People of the State of New York by its

Attorney General (referred to for convenience as the "State") against Lehman's former auditors,

Ernst & Young LLP ("E&Y"), under New York's Martin Act, a statute that, broadly speaking, addresses fraudulent and deceptive conduct in the securities industry, and another New York statute that addresses fraudulent practices also.  The State here contends that E&Y assisted Lehman in a scheme that involved the repeated, surreptitious, and temporary removal of tens of billions of dollars of securities from Lehman's balance sheets in order to create false impressions of Lehman's liquidity, thereby defrauding the investing public.

This action was commenced in the Supreme Court of the State of New York, County of New York.  E&Y removed the case to this Court on the contention that the claims asserted against it arise under federal law.  The State initially disputed E&Y's contention, arguing that its claims arose only under state law, and moved to remand the case to the state court.  Following oral argument, however, the State abandoned that argument and withdrew its motion to remand.

If jurisdiction could be conferred upon the Court by agreement of the parties, the withdrawal of the remand motion would have been dispositive.  But "[t]he district courts of the United States . . . are 'courts of limited jurisdiction.  They possess only that power authorized by the constitution and statute.'"[1]   In consequence, they have an independent obligation to consider the question of subject matter jurisdiction *sua sponte*, regardless of any agreement by the parties before them.[2]  This Court therefore remained obliged to examine its jurisdiction despite the State's concession.  It now concludes that the removal was improper because the case does not come within federal jurisdiction.  This action therefore will be remanded whence it came.

---

[1]
    *Exxon Mobil Corp.v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (1005) (citing *Kokkonen v. Guardian Life Ins. of America*, 511 U.S. 375, 377 (1994) (citation omitted)).

[2]
    *E.g., Freytag v. C.I.R.*, 501 U.S. 868, 898 (1991); *Andrus v. Charlestone Stone Prods. Co. v. Finn*, 341 U.S. 6, 17-18(1951).

The Court has not reached this result lightly.  The Judicial Panel on Multidistrict Litigation some time ago determined that all federal securities and ERISA cases, wherever commenced, that relate to the Lehman collapse and attendant circumstances, and that raise common questions of fact, would be transferred here for pretrial proceedings in order to secure the benefits of a unified approach.  There are 47 such cases, this one aside, pending before the undersigned for that purpose.

This case would benefit from being a part of that process, as the discovery that will be sought, the factual issues and at least some legal questions that will be raised here will overlap quite substantially with the other 47 cases.  The remand of this action to the state courts thus entails a risk that the efficiencies that otherwise would have been gained will be lost and the burdens of the litigation on parties and witnesses increased.  But this Court nonetheless has come to the view that remand of this action is the only course open to it in the present posture of the case.

*Facts*

This action was filed in the wake of the Lehman collapse and bankruptcy, one element of which forms an important backdrop of the case.

I.      *The Bankruptcy Examiner's Report and Repo 105s*

The Bankruptcy Court in the *Lehman* case appointed an examiner to investigate and report on matters relating to the firm's failure.  On March 11, 2010, the examiner issued a nine-

4

volume report on his investigation.[3] An important focus of the report is a type of transaction known as a "Repo 105."

As this Court explained in a previous decision:

"Repo is short for repurchase agreement. A repo is a two-step transaction that may be used to obtain short-term funding. In the first step, the entity needing funds – the transferor – transfers securities or other assets to a counter-party in exchange for cash. It concurrently agrees to reacquire the transferred assets at a future date for an amount equal to the cash exchanged plus an agreed-upon charge that may be analogized to, and are here referred to, as interest. In the second stage, the transferor pays the counter-party the original cash amount plus the agreed-upon interest, and the counter-party returns the originally transferred assets. The repo thus is like a loan. In the first step, the counter-party provides cash to the transferor in exchange for a promise by the transferor to repurchase the transferred assets. In the second step, the transferor repays the counter-party with interest and gets its collateral back. The length of time between the initial transfer and the repurchase date can vary, as can the interest and the transferee's ability to use the assets while the repo is in place."[4]

The examiner reported that Lehman employed two types of repos, the second of which:

"was known as a 'Repo 105.' Repo 105 transactions involved the same two steps as Ordinary Repos. But Lehman [was said to have] treated them differently for financial reporting purposes. The asset that was the collateral of a Repo 105 was treated as though it actually had been sold and therefore removed from Lehman's balance sheet. Further, Lehman then used the cash received from Repo 105 transactions to pay down other existing liabilities. This practice decreased its net leverage ratio because it reduced the numerator in the ratio (net assets) by (a) the 'sale' of the 'collateral,' and (b) the use of the cash thus obtained to pay down other debt, while having no effect on the denominator (tangible equity)."[5]

---

[3] Report of Anton R. Valukas, Examiner, *In re Lehman Brothers Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Mar. 11, 2010), DI 7531 (footnotes omitted).

[4] *In re Lehman Bros. Secur. And ERISA Litig.*, 799 F. Supp. 2d 258, 268, (S.D.N.Y. 2011) (footnotes omitted).

[5] *Id.* at 269 (footnotes omitted).

5

II.     *The Complaint*

The complaint focuses on Lehman's escalating use of Repo 105 transactions during 2007 and 2008. It alleges that the investment bank increasingly relied on these transactions to improve the company's reported leverage, making it appear that the bank was more liquid than it really was.[6] This underreporting of the extent to which Lehman's assets were leveraged, along with the bank's increasing liquidity issues, is alleged ultimately to have led to its failure.

The complaint alleges that E&Y "not only approved but consistently supported Lehman's Repo 105 policy, and advised Lehman that it could take advantage of an accounting rule, FAS 140, to treat these Repo 105 transactions, which in reality were short-term financings, as 'sales,' enabling Lehman to remove the securities from inventory on its financial statements until they were repurchased."[7] As Lehman escalated its use of Repo 105 transactions, it continued to treat them as sales rather than as loans. E&Y continued to audit and review Lehman's financial statements and approve Lehman's concealment of these transactions, which it is alleged to have known about as early as 2001.[8] It provided a "clean" audit opinion each year, stating its view that Lehman's financial statements complied with generally accepted auditing principles ("GAAP").[9] When Lehman ultimately filed for bankruptcy in 2008, plaintiff alleges, this was in no small part

---

[6]     Cpt. ¶ 1.

[7]     *Id.* ¶ 1.

[8]     *Id.* ¶ 5.

[9]     *Id.* ¶ 3.

6

due to the liquidity issues and improper reporting surrounding the usage of Repo 105 transactions.[10]

The complaint points to a variety of acts and omissions in which E&Y allegedly was involved. These are said to have included, but not been limited to its (1) approval of Lehman's internal policy of utilizing Repo 105 transactions to "manage balance sheet metrics " and "reduc[e] the balance sheet as firm inventory [*sic*],"[11] (2) awareness of Lehman's escalated use of Repo 105 transactions during 2007 and 2008,[12] (3) approval of financial statements, disclosures, and reports that allegedly "concealed" the use of Repo 105 transactions, with the knowledge that these items materially misstated Lehman's financial position,[13] and (4) failure to disclose whistleblower allegations against Lehman regarding the use of Repo 105 transactions.[14]  These acts and omissions are alleged to have violated both GAAP and generally accepted auditing standards ("GAAS").

The complaint contains four causes of action against E&Y, three under New York

---

[10]
    *Id.* ¶ 4.

[11]
    *Id.* ¶¶ 17, 18.

[12]
    *Id.* ¶¶ 25-31.

[13]
    *Id.* ¶¶ 32-35.

[14]
    *Id.* ¶¶ 51-53.

State's Martin Act[15] and one under New York Executive Law § 63(12).[16]  Three of those causes of

action plainly assert no claims arising under federal law.  The first cause of action, however,

presents a closer question.   It is two paragraphs long, and it reads in its entirety:

> "72.    The Attorney General repeats and re-alleges paragraphs 1 through 71 above as if fully stated here."

> "73.    The acts and practices alleged above violated Article 23-A of the General Business Law, as defined in General Business Law § 352, in that Defendant E&Y issued false statements regarding its audits and reviews of Lehman's financial statements."[17]

Thus, one must look elsewhere to determine the allegedly "false statements regarding [E&Y's]

audits and reviews of Lehman's financial statements" that are alleged to form the basis of this claim.

> The complaint alleges only two statements by E&Y.  Paragraph 58 alleges:

> "58.    As Lehman's auditor, E&Y signed off on each of Lehman's annual disclosures, certifying their compliance with GAAP.  Each Form 10-K included a Report of Independent Registered Public Accounting Firm signed by E&Y, representing:

> 'In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company . . . in conformity with U.S. generally accepted accounting principles.  Also in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly, in all material respects the information set forth therein.'"

---

[15]

N.Y. GEN BUS. L. §§ 352-53.

[16]

N.Y. EXEC. L. § 63(12) provides a right of action for the Attorney General of New York to prosecute persistent fraudulent or illegal business transactions on behalf of the people of New York.

[17]

Cpt. ¶¶ 72-73.

Paragraph 60 then alleges:

> "60.    Similarly, each quarterly disclosure (Form 10-Q) contained a 'Report of Independent Registered Public Accounting Firm' signed by E&Y, stating that, based on a review of Lehman's consolidated financial statements in accordance with the standards of the PCAOB, 'we are not aware of any material modifications that should be made to the consolidated financial statements referred to above for them to be in conformity with U.S. generally accepted accounting principles.'"[18]

The question therefore is whether the claims that these statements were false arise under federal law, thus giving E&Y the right to remove the action.

*Discussion*

I.      *GAAS and GAAP*

It is important at the outset to focus on the precise nature of the State's claims of false statements by E&Y.

Paragraphs 73 and 58 together allege that E&Y falsely stated that (1) it was E&Y's opinion (2) that Lehman's financial statements fairly presented its consolidated financial position (3) in conformity with GAAP and that (4) the related financial statement schedule, considered in context, fairly presented the information it portrayed.  The respects in which this statement might have been false are several.  Perhaps the suggestion is that E&Y did not in fact hold the opinions it claimed to have held, but in fact believed something else.[19]  Or perhaps the claim is that E&Y in

---

[18]    *Id.* ¶¶ 58, 60.

[19]    *See, e.g., Fait v. Regions Fin. Corp.,* 655 F.3d 105, 110 (2d Cir. 2011) (when claim is "based upon a belief or opinion . . . , liability lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed"); *In re Lehman Bros. Sec. & ERISA Litig.,* 799 F. Supp. 2d 258, 275 (S.D.N.Y. 2011) ("expression

fact held the quoted opinions, but the opinions were wrong in one sense or another.  Neither of these possibilities, however, would implicate any federal issue of law.  That is so even with respect to whether Lehman's financial statements conformed to GAAP, as GAAP are promulgated by the Financial Accounting Standards Board (the "FASB"), which is an independent, private entity.  The other alleged falsity relied upon by the State, however, presents a somewhat different picture.

Paragraphs 73 and 60 together allege that E&Y falsely stated in quarterly disclosures that, (1) based on a review of Lehman's consolidated financial statements (2) in accordance with the standards of the PCAOB, (3) E&Y was not aware of any material modifications that should be made to Lehman's consolidated financial statements to be in conformity with GAAP.  Again, the respects in which this statement might have been false are at least three.  First, the statements might have been false because E&Y made no reviews of Lehman's financial statements.  Second, they might have been false because E&Y made reviews, but it did not do so "in accordance with the standards of the PCAOB."  Finally, they might have been false because E&Y, contrary to its statement, was aware of material modifications to Lehman's financials that should have been made to conform with GAAP.

As the complaint elsewhere claims that E&Y violated GAAS in a plethora of respects, paragraphs 73 and 60 manifestly assert that E&Y's declarations in connection with Lehman's quarterly financials were false at least in the second of these respects, *viz.* that E&Y said that it had conducted its reviews "in accordance with the standards of the PCAOB" when in fact it

---

of opinion . . . [is] actionable only if . . . [the] complaint alleges that the speaker did not truly have the opinion at the time it was issued") (internal quotation marks and citations omitted; *In re Lehman Bros. Sec. & ERISA Litig.,* 684 F. Supp. 2d 485, 494 (S.D.N.Y. 2010) ("A statement of reasons, opinion or belief by such a person when recommending a course of action to stockholders can be actionable under the securities laws if the speaker knows the statement to be false.") (internal quotation marks and citations omitted).

had not.

The questions whether E&Y falsely stated that it had reviewed the financials when, in fact, it had not or falsely stated that it was unaware of necessary material modifications necessary to conform to GAAP when, it fact, it was aware of such modifications raise no federal issues.  But the question whether E&Y performed its reviews "in accordance with the standards of the PCAOB" is another matter entirely.[20]

GAAS were not much different in their genesis, for present purposes, than GAAP. They were promulgated by the American Institute of Certified Public Accountants, another independent, private entity.  In 2002, however, Congress enacted the Sarbanes-Oxley Act ("SOX"),[21] which established the Public Company Accounting Oversight Board ("PCAOB") and charged that entity with making "auditing and ethics standards" that govern the conduct of accounting firms conducting audits of public companies.[22]  Shortly after its creation, the PCAOB expressly adopted some GAAS rules, thereby federalizing them.[23]   It has modified others and continues to promulgate

---

[20]

A statement that E&Y's reviews, assuming reviews occurred, were conducted in accordance with GAAS or standards of the PCAOB of course was, or at least might well have been, one of opinion as well.  *See In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d at 302.  But nothing turns on this for present purposes.

[21]

Sarbanes-Oxley Act of 2002, Pub. L. 107-204, 116 Stat. 745 (2002).

[22]

15 U.S.C. § 7211.

[23]

*See, e.g.,* PCAOB Rule 3200T – *Interim Auditing Standards* (adopting GAAS as interim auditing standards ("AU"), pending further modifications**)**.  This Rule subsequently received SEC approval.  *See Order Regarding Section 103(a)(3)(B) of the Sarbanes-Oxley Act of 2002;* Release Nos. 33-8222 and 34-47745 (Apr. 25, 2003).

new and modified rules governing the conduct of auditors of public companies.[24]    All rules promulgated by the PCAOB are subject to the specific approval of the Securities and Exchange Commission ("SEC").  Moreover, SOX makes any violation of a PCAOB rule a violation of the Securities Act of 1934.[25]    Accordingly, if and to the extent that the State asserts that E&Y's statements in Lehman's quarterly reports falsely asserted that its reviews were conducted in accordance with "standards of the PCAOB," the validity of its assertion cannot be determined without deciding just what PCAOB standards require, which is a question of federal law.

II.     *Federal Question Jurisdiction*

          A case may be removed under Section 1441 of the Judicial Code[26] if it would fall within a district court's original subject matter jurisdiction.  Federal question jurisdiction exists over "all civil actions arising under the . . . laws . . . of the United States."[27] An evaluation of whether a given action arises under the laws of the United States is governed by the "well-pleaded complaint" rule, which provides that "a defendant may not remove a case to federal court unless the plaintiff's

---

[24]

          *See, e.g.*, PCAOB Auditing Standard ("AS") No. 3 – *Audit Documentation* (superseding and modifying AU § 339 – *Audit Documentation*).

[25]

          15 U.S.C. § 7202(b)(1) (violations of PCAOB rules treated "for all purposes in the same manner as a violation of" the Exchange Act).  *See also PCAOB Rulemaking: Public Company Accounting Oversight Board; Notice of Filing of Proposed Auditing Standard No. 1, References in Auditors' Reports to the Standards of the Public Company Auditing Oversight Board*, Release No. 34-49528 (Apr. 6, 2004) ("While [GAAS] may be generally accepted in a variety of contexts, what gives them the force of law in the context of public company audits is adoption by the PCAOB and approval by the SEC.").

[26]

          28 USC §1441.

[27]

          28 U.S.C. § 1331.

complaint establishes that the case 'arises under' federal law."[28]  The party that removes the case

bears the burden of establishing that there is a valid basis for federal question jurisdiction.[29]  So long

as there is federal jurisdiction over at least one claim in a complaint, a federal court may hear the

entire action.[30]  If there is no federal question jurisdiction over any claim, the case must be remanded

to state court.[31]

> In this case, the State purports to base each of its four causes of action on state law.
E&Y argues, however, that the State has pleaded a state law claim that requires, or at least may
result in, a resolution of a substantial federal question, viz. whether E&Y's statements regarding
Lehman's quarterly consolidated financial statements were "based on . . . review[s] . . . in
accordance with the standards of the PCAOB." It contends that the case therefore arises under
federal law and properly was removed to this Court.  This takes us to a subject often referred to as
the embedded federal question – a federal question that is implicated in what ostensibly is a
complaint based on state law – and when its presence does and does not afford a basis for removal
to federal court, a subject that has perplexed both the Supreme Court and scholars for at least a

---

[28]
> *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 10 (1983).

[29]
> *See, e.g.*, *Rubin v. MasterCard Int'l, LLC*, 342 F. Supp 2d 217, 219 (S.D.N.Y. 2004).

[30]
> 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

[31]
> 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

century.[32]   The Court, however, finds it unnecessary to trace the many twists and turns of the development of the law on this issue, as the most recent decisions of the Supreme Court and the Second Circuit are dispositive here.

For present purposes, the appropriate starting point is *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing,*[33] a state court action to quiet title to real estate against a purchaser which had bought the property in a federal tax sale.  The plaintiff, the former landowner, claimed that the buyer's title was invalid because the Internal Revenue Service had failed to give notice of its seizure of the property in exact conformity with the Internal Revenue Code.  The defendant title holder removed the action, contending that the plaintiff's claim arose under federal law because the plaintiff's contention that the defendant's title was invalid, though nominally a state law cause of action, depended upon construction of the federal tax code.

The Supreme Court upheld the existence of federal question jurisdiction.  In the course of doing so, however, it made clear that the presence or possible presence of a federal issue is not "a password opening federal courts to any state action embracing a point of federal law."[34]  Rather,

> "the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial

---

[32]  *See generally, e.g.,* 15 MOORE'S FEDERAL PRACTICE §§ 103.11[2]-[4] (3d ed. 2011); 13D CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS § 3562 (3d ed. 2011).

[33]  545 U.S. 308 (2005).

[34]  *Id.* at 314.

responsibilities."[35]

In other words, the determination of the state law claim "necessarily" must require resolution of the federal issue.  The federal issue must be actually disputed and substantial.  And federal resolution of the case must be appropriate given considerations of federalism.

In this case, the Court assumes, without deciding, that the question whether E&Y's reviews of Lehman's quarterly financials conformed to PCAOB, and thus GAAS, requirements is actually disputed and substantial.  It further assumes that its hearing this case – which in most practical respects is close to a mirror image of a plethora of cases already here under the federal securities laws – would not disturb the balance of federal and state judicial responsibilities.  But the question whether this state law claim "necessarily" raises the issue of conformity with PCAOB auditing standards is more troublesome.

To begin with, the complaint asserts four causes of action.  It seeks exactly the same relief on all four, and E&Y does not contend that the availability any of that relief depends upon a resolution favorable to the State on any of the four causes.  Thus, even at this "macro" level, it would be difficult to say that the issue of PCAOB conformity "necessarily" must be resolved to decide this case.

The same is true even at a more granular level.  The embedded federal issue of PCAOB conformity is present only in the first cause of action.  But its resolution is not necessary to resolution of even that particular claim for relief.

As we have seen, the essence of the first cause of action is that E&Y violated the Martin Act in two independent respects – its annual audit opinions and its declarations with respect

---

[35] *Id.*

to Lehman's quarterly financial statements each are said to have been false, but for different reasons. Thus, even the first cause of action could be decided in favor of the State, should the evidence support such a result, without ever reaching the question of the quarterly review statements. Relief could be granted on this cause of action based solely on the audit opinions.

The same could be said even of the portion of the first cause of action that alleges that the quarterly review statements were false. While the complaint overall makes clear that the State claims that the quarterly statements were false because E&Y's reviews did not comply with PCAOB auditing standards, paragraphs 60 and 73 of the complaint, taken in context, suggest that the declarations in connection with the quarterly statements were false also in that their assertion that E&Y was "not aware of any material modifications that should be made to the consolidated financial statements . . . for them to be in accordance with" GAAP was not accurate. Thus, that portion of the first cause of action could be resolved on the awareness of necessary material modifications point without any determination of the arguably embedded federal question.

This conclusion is consistent also with the Second Circuit's only elaboration on the *Grable* standard, which occurred in *Broder v. Cablevision Systems Corp.*[36] That was an action, initially brought in state court by a cable television subscriber. The plaintiff contended that he had been wronged in that the cable provider had extended a favorable rate to other customers without disclosing it to him, allegedly in violation of provisions both of the federal Communications Act and the state Public Service Law. The defendant cable provider removed the action to federal court, and the district court denied the plaintiff's motion to remand. The Second Circuit upheld that aspect of the decision below under *Grable.* But in the course of doing so, it wrote that, to decide whether

---

[36] 418 F.3d 187 (2d Cir. 2005).

removal had been appropriate under *Grable:*

> "[W]e must ascertain which portions of Broder's complaint comprise distinct 'claims.' A single claim over which federal-question jurisdiction exists is sufficient to allow removal. *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 125 S.Ct. 2611, 2623, 162 L.Ed.2d 502 (2005) . . . ; *City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 164-66, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997). Where a federal issue is present as only one of multiple theories that could support a particular claim, however, this is insufficient to create federal jurisdiction. *See Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 807-809, 811-813, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (interpreting 28 U.S.C. § 1338(a) as establishing an analogous rule, and stating that "[l]inguistic consistency" requires identical interpretations of § 1338(a) and 28 U.S.C. § 1331). But what a plaintiff presents as one 'count' may be understood to encompass more than one 'claim.' *See id.* at 810, 108 S.Ct. 2166 ('Petitioners' antitrust count can readily be understood to encompass both a monopolization claim under § 2 of the Sherman Act and a group boycott claim under § 1.'). The question is whether at least one federal aspect of Broder's complaint is a logically separate claim, rather than merely a separate theory that is part of the same claim as a state-law theory."[37]

It went on to state that "[o]ne of the key characteristics of a mere 'theory,' as opposed to a distinct claim, is that a plaintiff may obtain the relief he seeks without prevailing on it."[38]

In fairness to E&Y, *Broder*'s distinction between claims and theories, which derived from *Christianson v. Colt Industries Operating Corporation*[39] and has been criticized persuasively,[40] may be difficult to navigate, especially in the law- and fact-intensive scenarios that often may arise. But the overriding consideration here is that the Supreme Court in *Grable,* well after *Christianson,* made entirely plain that a *sine qua non* for removal on the basis of an embedded federal question is

---

[37]  *Id.* at 194.

[38]  *Id.* at 195.

[39]  486 U.S. 800 (1988).

[40]  *See generally* John B. Oakley, *Federal Jurisdiction and the Problem of the Litigative Unit: When Does What "Arise" Under Federal Law?,* 76 Tex. L. Rev. 1829, 1853-61 (1998).

that the state law claim in which it is embedded "necessarily" raise the federal issue.

Here, as demonstrated above, the State may obtain all the relief it seeks without prevailing on its contention that E&Y violated PCAOB auditing standards with respect to Lehman's quarterly financials. Indeed, that would be true even if the first cause of action were the only one in the complaint. Accordingly, regardless of whether the PCAOB issue implicated by the State's first cause of action is better regarded as a "claim" or a "theory," the first cause of action may be resolved without deciding it. Hence, none of the claims in the complaint arises under the laws of the United States.[41]

*Conclusion*

For the foregoing reasons, this action is remanded to the Supreme Court of the State of New York, County of New York.

SO ORDERED.

Dated:        March 22, 2012

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

_____

[41]    *See Christianson.*, 486 U.S. at 809-10 (stating that same standards govern "arising under" jurisdiction for patent and other federal question cases and that "a claim supported by alternative theories in the complaint may not form the basis for § 1338(a) jurisdiction unless patent law is essential to each of those theories"); 13D CHARLES ALAN WRIGHT ET AL., *supra*, § 3562, at 211 & n.86 ("claim supported by alternative theories in the complaint may not provide . . . basis for federal question jurisdiction unless federal law . . . essential to each").